UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
Mountain Highlands, LLC,
        Debtor.                          No. 11 - 06-10011 - SA

**MEMORANDUM OPINION IN SUPPORT OF ORDER DENYING CONFIRMATION
OF DEBTOR IN POSSESSION'S RESTATED PLAN OF REORGANIZATION**

        Debtor in possession Mountain Highlands, LLC ("Debtor" or

"Mountain Highlands") filed its Restatement of Debtor's Plan of

Reorganization Dated April 4, 2006 ("Plan") (doc 63), as modified

by the Debtor's First Modification to the Restated Plan of

Reorganization Dated April 4, 2006 (doc 88) and the Second

Modification to the Restated Plan of Reorganization Dated April

4, 2006 (doc 92).  Signature Capital Funding, Inc. ("Signature")

filed its objections (doc 86).  The modified plan and objections

thereto came before the Court for an evidentiary hearing on

confirmation.  Having considered the evidence and the arguments

of counsel, the Court finds that the Plan should not be

confirmed.

**Background**

        Debtor in possession ("Debtor") is a New Mexico limited

liability company whose managing member is The Shepard's Group,

Inc., a Nevada corporation.  Robert M. Janes is a director, vice

president and chief operating officer of Shepard's Group, and the

designated representative of Debtor.  Debtor owns the property

that is the basis for the proposed reorganization.  The property,

generally called Castle Creek Ranch, has several components:

approximately 2,757 acres of land (called Castle Creek Ranch in the appraisals, a usage which the Court adopts in this memorandum opinion) located in the Rio Costilla Recreational Area of the Sangre de Cristo mountains of Taos County, New Mexico; the SilverTree Lodge, a 21,725 square foot set of buildings located on the site; the Stonebridge Inn, 7,272 square foot building also located on the site; approximately 108.73 acre feet of water rights; part of a power line and the right of way for that power line; and various pieces of equipment that were part of the now defunct Rio Ski operation which previously operated on the site. Water, sewer, electric and telephone service is available to the site generally; those services have not been delivered to each of the proposed lots. The electricity comes by way of a power line from Kit Carson Electric Cooperative ("KCEC") which currently ends about one mile into the lower end of the real property.

Ignoring the earliest chapter 11 history of this property in its incarnation as a ski resort (marketed as "Ski Rio"), this chapter 11 case has its roots in the 1998 sale of the property by Magnolia Mountain Partners, Ltd. ("Magnolia") to Ski Rio Partners, Ltd. ("Ski Rio") for $400,000.[1] Ski Rio's general partner was JNC Properties, LLC, and JNC's manager in turn was

---

[1] Although some of the history of the property appeared in the pleadings or the testimony, the Court has also relied on the opinion in Magnolia Mountain Limited Partnership v. Ski Rio Partners, Ltd., 139 N.M. 288, 131 P.2d 675 (Ct. App. 2005) for clarifying background.

Page 2 of 27

John Lau.  Ski Rio executed a promissory note for $400,000 and a mortgage on the property to Magnolia.  In October 2000 Signature loaned $1,000,000.00 to Ski Rio at 12% interest (with a default rate of 18%), secured by a deed of trust, security agreement and financing statement on most of the property.  Signature exhibit 11.  The original term of the loan was six months, and it was renewed several times.  The $1,000,000 was intended as operating capital for other purposes, not a development loan, and in any event was not used to pay the $400,000 promissory note, which went into default sometime no later than early 2003.  In February 2003 Magnolia initiated a foreclosure action in the Eighth Judicial District Court, Taos County, New Mexico ("State Court") against Ski Rio.  Ski Rio failed to answer the complaint and so was defaulted in May 2003.  At the foreclosure sale in June 2003 Magnolia purchased the property.  In early August Magnolia then sold the property to Mountain Highlands.  At almost the same time Ski Rio moved to set aside the foreclosure judgment and sale, but the State Court, after initially granting the motion, subsequently denied it.[2]  Ski Rio appealed the denial of the motion to the New Mexico Court of Appeals, which affirmed the denial in a decision issued in December 2005.  Magnolia Mountain Limited Partnership v. Ski Rio Partners, Ltd., cited in note 1.

---

[2] Mountain Highlands, having purchased the property, was named by Ski Rio in a third-party complaint.  Mountain Highlands was subsequently dismissed from the litigation.

Case 06-10011-s11   Doc 131   Filed 12/14/07   Entered 12/14/07 14:13:48 Page 3 of 27

That decision became final when Ski Rio did not apply for a writ of certiorari to the New Mexico Supreme Court. The final judgment in effect cleared the title for Mountain Highlands of the claims of Ski Rio, JNC Properties and John Lau.[3]

In the meantime in December 2003 Signature had initiated its own foreclosure action in the State Court, naming among other defendants the parties described above. Signature filed a motion for summary judgment which the State Court denied. However, in December 2005, the State Court granted Signature's motion to reconsider its denial of the motion for summary judgment, and entered a judgment and a decree of foreclosure and order of sale. Signature exhibit 1. In doing so, the State Court did not rule on other pending pleadings. Id. Debtor, surprised to learn of the entry of the judgment and faced with an eminent foreclosure sale, filed its chapter 11 petition on January 5, 2006.

The Plan proposes to complete development of the real property (which includes implementing a swap of a sliver of the property in order to resolve an ongoing dispute) and to sell it. A relatively small portion of the land consists of about 36 acres platted into parcels of .27 acre to 3.1 acres. The remaining

---

[3] In 2003, Mountain Highlands also filed its own action against Ski Rio Partners and others, claiming slander of title, among other things. Mountain Highlands, LLC v. Ski Rio Partners, Ltd., CV 2003-73, Eighth Judicial District Court, Taos County, New Mexico, which was still pending when the petition was filed. Statement of Financial Affairs, question 4 (doc 10).

Page 4 of 27

2706 acres have been divided into parcels ranging in size from about 40 acres to 170 acres, and a few much smaller ones. Signature exhibit 3. Originally Debtor intended to obtain partial releases from the mortgage lien for the various lots; the second modification (doc 92) deleted that part of the Plan.[4] The Plan now provides that Debtor will pay Signature's claim in equal annual instalments over seven years if not sooner.[5]

**Analysis**

FEASIBILITY

Among the requirements for confirmation is that the plan be feasible. §1129(a)(11).[6] The test for feasibility is whether the Plan and its projections are supported by evidence that shows

---

[4] The second modification (doc 92) entirely superseded the first modification (doc 88). The first and second modifications explicitly refer back to the original plan (doc 21, filed April 4, 2006) and not to the restated (amended) plan (doc 63), but they match the amended plan and not the original plan; e.g., there is no section 6.3.2.2 in the original plan. The Court will treat the modifications as amending the (restated) Plan, as Debtor intended.

[5] Debtor has now filed a motion for approval of a §363(f) sale of the property. Doc 106. The Court is making its decision based on the record and the facts as presented at the evidentiary hearing, without regard to more recent developments, including the proposed sale as well as the overall tightening of the credit markets.

[6] Section 1129(a)(11) provides as follows: Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Case 06-10011-s11    Doc 131    Filed 12/14/07    Entered 12/14/07 14:13:48 Page 5 of 27

that all of the requisite payments more likely than not can and will be made.

> In determining whether a plan is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable.

Travelers Insurance Company v. Pikes Peak Water Company (In re Pikes Peak Water Company), 779 F.2d 1456, 1460 (10th Cir. 1985). (Citations and internal punctuation omitted.)  Put more precisely in the context of this case, "[w]hat is important is that the trier of fact have evidence on which to base its finding that it is more likely than not that Debtor will be able to make all payments required by the Confirmed Plan."  F.H Partners, L.P. v. Investment Co. of the Southwest, Inc. (In re Investment Co. of the Southwest), 341 B.R. 298, 315 (10th Cir. BAP 2006) ("ICSW"). In ICSW, the BAP ruled that an amortization schedule and sales history that failed to show how sufficient funds would be generated to pay secured creditors did not support the finding of feasibility.  Id. at 316-17.  Although that particular case involved partial releases to permit individual lot sales, a feature that Debtor has specifically deleted from this Plan, ICSW does require a substantiated prediction of where the funds will come from to timely make the requisite payments.

The Court finds that the Plan does not meet the feasibility test.  What Debtor established was that it might well make the first plan payment due to Signature.  It did not establish with

Case 06-10011-s11    Doc 131    Filed 12/14/07    Entered 12/14/07 14:13:48 Page 6 of 27

any certainty where the remainder of the payments to Signature and the operating expenses would come from.

The unmodified Plan (doc 63) provided that Signature would be selling off parcels of its land, ¶7.7, with the aid of compelled partial releases, ¶6.3.2.1(D), and using the income generated to make debt service.  ¶6.3.2.1(C).  Proceeds from the sale of water rights would also be used to pay down the Signature debt.  ¶6.3.2.2.  However, the provisions for compelled partial lien releases provided by  ¶6.3.2.1(D) were deleted from the Plan by the second modification (doc 92), which provides for merely consensual partial releases from Signature and which also addressed partial lien releases as might be needed for the sale of water rights.  Thus what remains to fund the plan, other than a sale of so much land and/or water rights that would pay Signature's claim in full, is Debtor's promise that its affiliate Pepper Highlands, LLC ("Pepper") will make the debt service to Signature and pay all the other expenses.[7]  Plan, ¶7.9.

Pepper is one of several entities formed by Robert Janes and others, each specific to a particular development project in various parts of the western United States.  Examples include Pepper, which owns real property in Cotati, California and is

---

[7] ¶¶6.3.2.3 and 6.3.3.1(D)(3) provide for delivery of about .75 acre of land to David Hendricks, a partial lien release to make that possible, etc.  The non-confirmation of the Plan moots consideration of those provisions.

developing residential lots in Petaluma, California; and Desert
Highlands, LLC, developing residential lots in Elephant Butte,
New Mexico (Rancho del Lago II).  In each of these, with the
exception of the Helaman Group, Mr. Janes is the vice-president
and chief operating officer.  According to the testimony, the
various related companies use their separately owned assets
together in order to synergize the development efforts of each
company.  For example, Shepard's Highlands has obtained heavy
construction equipment which Mr. Janes testified would be used to
put in roads and other infrastructure to Debtor's property.

Mr. Janes testified that among the various affiliates was a
significant collection of assets, and that the affiliates were
prepared to commit their resources to make this project work.
Mr. Janes specifically stated that Pepper and Shepard's Highlands
would be sources of funding for the reorganized Debtor.  That
incentive of increasing the wealth of the various owners of all
the affiliates was offered as another badge of feasibility.
However, what the Plan actually proposes is only that Pepper will
commit itself in writing to fund the Plan.  And there are several
problems even with this commitment.

To begin with, Pepper itself has not yet committed to do
anything (even though Mr. Janes is the vice-president and chief
operating officer of its managing member).  The Plan says that
Pepper is only required to commit itself after the Plan has been

confirmed[8].  Plan, ¶7.9.  The form of documents that Pepper will execute will be subject to notice and hearing.  In other words, rather than make clear in the course of confirmation exactly what Pepper is willing to commit to do, in the form of documents that would be examined and perhaps contested by Signature and other creditors as part of the confirmation process, the Plan leaves that critical issue to be resolved after confirmation, effectively making the issue a condition subsequent to confirmation.  Quite simply, that is a formula that invites litigation and almost guaranties that there will not be an effective confirmation for many months thereafter, if ever.[9]

Instead, those documents should have been included with the Plan or put into the Plan so they could have been subject to objection and approval.  Then Pepper's obligation would have been clear.  And, for that matter, there was no reason that Pepper could or should not have executed the documents beforehand

_____

[8] Presumably this means that Pepper need not commit itself until the Effective Date, defined in the Plan as "the first day of the first month next following the expiration of sixty days after the date upon which an Order confirming this Plan becomes final."  Plan, ¶1.1.15.  Assuming no appeal of an order confirming the Plan (a less than assured contingency), and assuming a confirmation ordered in the middle of a given month, the Effective Date would not occur until about 2 1/2 months after confirmation.

[9] At closing Debtor's counsel stated that Debtor contemplated Pepper executing an instrument satisfactory to Signature.  Given the parties' contentious relationship, that would be a remarkable feat to accomplish.

Page 9 of  27

(subject to modification if needed as a result of the confirmation hearing), with the only contingency being confirmation.

Even assuming Pepper had bound itself to fund the Plan, it is not at all clear what comfort creditors might take from that commitment. Nothing in ¶7.9 obligates Pepper to pledge its assets to assure payment. And as Signature argued, it appears possible or even likely that the Pepper development will be finished and its inventory of lots sold out within two years.[10] Thus, unless Pepper were willing to secure its obligations with the proceeds of the lot sales, say in the form of a certificate of deposit or some other collateral, the creditors could be forgiven for wondering whether Pepper's commitment practically is for no more than a year or two.[11]

Alternatively, Debtor could have established a business plan that would result in sufficient sales of its assets to meet its debt obligations. It did not do that either. It withdrew (perhaps wisely) its proposal for partial lien releases that

---

[10] To be sure, Mr. Janes testified that Pepper intended to be operating for several years. However, with only seven lots in inventory, even as high-end as they may be, one wonders how long the selling period would be.

[11] The Court is not going so far as to suggest that combining a dispute over the form of documents and the likely relatively short life of Pepper's project in California could lead to Pepper effectively never making or even committing itself to make any payments under the Plan.

would allow it to make debt service through the sale of its inventory. Doc 92. That essentially left it in the position of having to obtain a sale of such a large amount of its inventory, or a moderate amount of its inventory for such a good price, that it could with some confidence persuade or coerce Signature into granting partial lien releases or the release of the mortgage altogether. Although there was testimony from Mr. Janes about Debtor's development plans and appraisals and testimony from Mr. Jordan about property values, Debtor never submitted a business or marketing plan for the property that would show how Debtor intended to accomplish that goal. In fact, Mr. Janes candidly testified, among other things, that he did not know what the marketing expenses would be or what amounts Debtor would need to borrow during implementation of the Plan.

Debtor also suggested that it could borrow the funds to continue to make Plan payments. Debtor showed that affiliates and particularly one of the owners Dave Johnson, had obtained several loans from Premier Mortgage Northwest out of Spokane, Washington. And Mr. Janes testified that loans were relatively easy to get when collateral was available, and that Pepper had been able to shop around and obtain a loan at a lower interest rate than Premier was willing to loan at. His testimony was reinforced by that of Patrick McDermott, a broker for Premier, who testified that Premier had mostly made residential loans but

was starting to do more commercial loans.  Mr. Janes also
testified that most (non-consumer) lending now was asset based.
Mr. Janes' assessment of the lending market for commercial real
estate development was not challenged by Signature.  On the other
hand, Mr. McDermott testified that Premier would never lend
behind Signature.  Debtor has not even applied to Premier for a
loan, and Mr. Janes testified that he did not know what the
expenses would be to obtain a loan, what amount might be
borrowed, and who might do the lending.  Premier currently has no
loans out to any of the affiliated companies, and in fact its
current lending is all to Mr. Johnson, who appears to be using
the affiliates and their assets to guaranty repayment of his
personal loans.  The Court concludes that there is no assurance
whatever, or even a serious possibility, that Premier would loan
on this project.

     In closing argument Debtor characterized the first payment
as the litmus test for feasibility.  It is not.

>     While courts often do not require projections for the
>     same period over which a long-term plan spans, a debtor
>     must still sustain its burden to somehow prove it will
>     be able to perform all obligations it is assuming under
>     the plan.

ICSW, 341 B.R. at 311.  Thus, Debtor needed to show that, for the
life of the Plan, it or its related entities had the resources to
continue to make the required payments for debt service to
Signature and for ongoing expenses, and that the related entities

would make those payments if Debtor could not.  Debtor did not
make that showing.

In fact, there is some question about whether Debtor has
available to it the resources to make that first payment.  Mr.
Janes testified under cross examination that Pepper and Shepard's
Highlands together did not have the $700,000 which Signature's
counsel suggested was needed.  The Court has calculated the
Debtor needed to have a minimum of about $654,000 to make the
payments due upon confirmation, and likely higher.[12]  Debtor put
the number at $536,000.  Debtor exhibit L.  And these sums do not
take into account the approximately $200,000 that Debtor will
need to have available to operate for the first year following
confirmation.[13]  There was little evidence about what Shepard's
Highlands could actually contribute.  In consequence the Court
finds that there is insufficient evidence of Debtor's ability to
come up with the first payment plus the first year of
postconfirmation operating expenses (a total of approximately
$850,000), although the Court concedes that the issue is a close
one.

_____

[12] The calculation is set out in the opinion below, in note
19 and the text accompanying the note.

[13] Mr. Janes also testified that KCEC requires upgrading of
the power line and right of way before taking it over, the cost
of that may be as much as $175,000, Sheperd's Highlands has said
it will make that payment but Sheperd's Highlands is not willing
to be bound to foot that bill.

Page 13 of  27

Debtor also argued that past expenditures are a good indicator of feasibility.[14] But it is probably more accurate to say that past expenditures are a strong indicator of a debtor's commitment to the project, which is at best only partially probative of feasibility. The history of chapter 11 and bankruptcy generally is heavily populated with companies and individuals whose hopes and dreams far outlasted their money.

> The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promises creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.

Pikes Peak, 779 F.2d at 1460. (Quotation marks and citation omitted.) At the end of the day, the harsh light of the feasibility test discloses a Plan that may or may not assure the first year's payments but certainly assures little else.[15]

CRAMDOWN UNDER §1129(b)(2)(A)

Debtor's strategy appears to have been to show that Signature's interest was so adequately protected after the first payment was made, and especially if the second annual payment was

_____

[14] Ironically, one expenditure Debtor has never made is even a single payment to Signature since it purchased the property in 2003.

[15] The Court is not suggesting that Debtor and its affiliates do not have every intention of making the project successful. However, what Debtor presented was more of an opportunity for an investor with patience, deep pockets and an appetite for risk. That is not the standard for confirming a plan.

Page 14 of 27

made, that Debtor would then be afforded the time to do what it needed to get the lots sold.  That raises the issue of whether Signature's interest was adequately protected pursuant to §1129(b)(2)(A) since Signature voted against the Plan.

Adequate protection of a creditor's interest in property of the estate should not be confused with the separate requirement that a plan be feasible; a plan must meet both requirements to be confirmable.  Nevertheless, the provisions are related in that plan provisions that fully protect a creditor's interest may allow a debtor more leeway in performing a plan.  See Pikes Peak, 779 F.2d at 1459 (plan provided that three years from confirmation date, reorganized debtor would have paid secured creditor in full, or have gotten current on loan, or would have made other financing arrangements satisfactory to Travelers, failing which debtor would agree to modification of stay to permit creditor to foreclose on assets worth $3,500,000 to pay accrued debt of $2,887,000; creditor held adequately protected and plan confirmed).  In this case, of course, the Court has already ruled that the Plan has not been shown to be feasible.

Whether Signature's interest in the Debtor's property is adequately protected is determined in part by the amount of the debt.  That has been an ongoing issue in this case which the parties have not (yet) fully litigated in this court.  The December 1, 2005 state court judgment declared the debt to be

Case 06-10011-s11    Doc 131    Filed 12/14/07    Entered 12/14/07 14:13:48 Page 15 of 27

$1,476,552.25 but did not adjudicate the cross claim and did not have Rule 54(b) language making it a final judgment.[16]  Signature exhibit 1.  The Plan provided for a return to the State Court in order to obtain a "final non-appealable" judgment or decision. ¶6.3.2.1(C)(2) (Signature judgment), ¶6.3.3.1 (Magnolia Mountain judgment) and ¶9.8.  However, other parts of the Plan, including the provisions cited in the previous sentence, also speak of "final" judgments or orders: ¶1.1.12 (final confirmation order), ¶6.1.12 (final orders on administrative expenses), ¶¶6.3.2.1(C)(1) and (2) (final state court judgment on Signature debt) and ¶¶6.3.3.1(C)(1) and (2) (final state court judgment on Magnolia Mountain debt).  Judging by the comments of Debtor's counsel during closing arguments, Debtor apparently expected, and led Signature to expect, a quick final ruling from the State Court which would be treated as settling the issue, without an appeal, regardless of conflicting language in the Plan.  The parties have subsequently informed the Court that the State Court "finalized" its judgment without adjudicating the remaining issues and without Rule 54 language, and that that judgment is now on appeal.

This Court needs a number to work with.  Since the State Court has made at least an initial adjudication of the debt, the

---

[16] The Rules of Civil Procedure for New Mexico state courts are modeled on the Federal Rules of Civil Procedure.

Court will start with the $1,476,552.25 and go from there. Throughout these proceedings, including the confirmation hearing, Signature has used the judgment figure – $1,476,552.25 – plus varying additional numbers representing interest at various rates, attorney fees, and other costs.  <u>E.g.</u>, Signature exhibits 4, 9 and 10.

To bring that number up to date, Signature put into evidence redacted copies of bills for attorney fees and costs, Signature exhibits 5-8[17], and calculations of the total debt owed as of about March 2007 based on post judgment interest rates of 18% (default rate), Signature exhibit 9 ($1,994,512.26), and of 12% (non-default rate), Signature exhibit 10 ($1,878,977.10).  Since the loan was in default when the foreclosure action was initiated and the judgment rendered, that rate should apply to accruing post petition interest.  N.M.S.A. §56-8-4(A)(1) (2007 Repl. Pamp.)[18]  <u>See</u> <u>Century Bank v. Hymans</u>, 120 N.M. 684, 692-94, 905

---

[17] The Court has cursorily reviewed these exhibits.  They raise some questions.  For example, in Signature exhibit 5, Mr. Clarke of Cuddy, Kennedy, Albetta &Ives, LLP appears to bill almost exclusively in increments of one hour; and the firm of Barlow Garsek & Simon, LLP apparently bills in quarter-hour increments.  Signature exhibit 6.  Should the issue of how much Signature is entitled to collect in attorney fees need to be more particularized in the future, Debtor (and any other party in interest) is not precluded from objecting to the fees.  In the meantime, the numbers proffered by Signature appear to be close enough for purposes of this decision.

[18] That subsection provides as follows:
Interest shall be allowed on judgments and decrees for
(continued...)

Page 17 of  27

P.2d 722, 730-32 (Ct. App. 1995)(variable rate in promissory note underlying judgment required judgment interest rate to be recalculated each year). The 18% rate is not unconscionably high. <u>See</u> <u>First National Bank in Albuquerque v. Energy Equities Inc.</u>, 91 N.M. 11, 17, 569 P.2d 421, 427 (Ct. App. 1977) (court required to award interest at default rate of 10% rather than nondefault rate of 7.5%). Thus the Court will treat the Signature debt as approximately $2 million for purposes of assessing adequate protection.

Debtor's approach, as clarified in closing argument, basically was to provide an initial pay down of about $211,000 (1/7 of the state court judgment number) plus all accrued interest, and 1/7 of the accrued attorney fees. Using Signature exhibit 9, the interest would be approximately $346,000 and 1/7 of the attorney fees would be (approximately $164,000 ÷ 7 =) $23,500. Together those figures total approximately $580,000.[19]

---

[18](...continued)
the payment of money from entry and shall be calculated at the rate of eight and three-quarters percent per year, unless...the judgment is rendered on a written instrument having a different rate of interest, in which case interest shall be computed at a rate no higher than specified in the instrument;...

[19] In addition to the $580,000, the Plan calls for payments upon confirmation of approximately $74,000 to two other creditors. Debtor exhibit L. These figures do not take into account sums due to Debtor's chapter 11 counsel; Mr. Janes testified that he did not know what that figure was. In consequence, the total of $654,000 may be understated by tens of
(continued...)

Were that sum paid to Signature on confirmation, Signature would be left with a debt of ($1,266,000 + attorney fees of at least $141,000 =) $1,407,000, plus accruing interest. (Again, all of these figures are calculated as of the date of the confirmation hearing; they presumably would need to be updated by the time of any payment or deposit following confirmation.)

To begin with, Debtor's water rights cannot be treated as securing repayment of Signature's claim for adequate protection purposes. Debtor's Schedule D explicitly states that Signature's claim is secured by "all real property except Silvertree and water rights". Doc 10. And the second modification clearly reserves Debtor's rights to contest Signature's claim to the water rights. Signature rightly argues that Debtor cannot have it both ways: Debtor may not hold the water rights up as securing repayment of Signature's claim and then try to snatch them away once it has confirmed its Plan. Debtor is thus left with its land and improvements (exclusive of Silvertree), coupled with the proposed stream of payments, as adequate protection for cramdown purposes.

Debtor's testimony about the value of the land and the improvements was anchored in three appraisals produced by George Jordan. Debtor exhibits A (2,757 acres of land), B (Stonebridge

---

[19](...continued)
thousands of dollars.

Inn) and C (Silvertree Lodge).  However, since Signature's deed
of trust does not cover Silvertree[20], the most relevant
appraisals are for the raw land comprising Canyon Creek Ranch
(Exhibit A) and Stonebridge Inn (Exhibit B).

The Canyon Creek Ranch land was valued, as of April 2006, at
$5,650,000, assuming a marketing/absorption period of three
years; Stonebridge was valued at $400,00 on the same
assumptions.[21]  These figures are quite artificial; on
instructions from either Debtor or Premier Mortgage, the
appraisals made the extraordinary assumption that the lots were
completely developed and the improvements completely refurbished
and updated.  Exhibits A, B and C at iii.  The appraisals stated
that as of April 2006, were the properties ready for sale,
including all utilities in place for the real estate and the
lodge and inn completely renovated and updated to current market
standards, and were financing readily available, and were a
professional development and marketing program in place, then
each of the properties would have the "hypothetical market value"
stated.  Id.  Whatever may have been the reasons for this
approach originally, it resulted in appraisals of considerably

_____

[20] Magnolia has a first lien on Silvertree.  Schedule D (doc
10).

[21] The value for Silvertree was $1,000,000 on the same
assumptions.

diminished value for determining the value of the properties "as is".[22]

In consequence, the more useful portions of the appraisals are contained in the feasibility and cost analyses. For the Canyon Creek lots, the value of "the land in its native state"[23], Debtor exhibit A at 32, or "as if vacant and without any improvements or approvals" (emphasis in text deleted), id. at 38, is $1,800,000.[24] Mr. Jordan testified that although there were

---

[22] Because the Court is not using the "hypothetical market value" figures, the Court does not need to address the shortcomings of those parts of the appraisals, such as the unduly short absorption rates, the competition from other developments in Angel Fire, Red River, Taos and Jemez, where the development financing would come from, the lack of stoves in the Stonebridge rooms when they are renovated, the challenge of marketing the renovated Stonebridge rooms for the (so far) unheard of price of $150 per square foot (about $45,000 per unit), etc.

[23] The Court found Mr. Jordan's testimony about any added value from the power line quite unclear; that is, it is still not clear to the Court whether Mr. Jordan's figure of $1,800,000 took into account the existence of the power line and right of way, or whether perhaps another $180,000 or so of value should be added to the $1,800,000 to arrive at a more accurate figure. Thus Debtor has not met its burden of persuasion of this specific item and the Court has adopted the value of $1,800,000 with the power line in place as is. Should there be further hearings in which this issue again arises, either party may want to supplement the record.

[24] The analogous value for the land only for Silvertree is $40,000. Exhibit C at 30. Mr. Jordan also testified that he did not analyze what the Silvertree current value would be. While the Court does not accept the "hypothetical market value as if complete" appraisal figures (one of the standards required by the client and not necessarily one that Mr. Jordan would have employed if not so instructed), the Court finds that Mr. Jordan's testimony was straightforward and credible.

Page 21 of 27

improvements on the property beyond its "native state" (improvements in this sentence defined as roads, platted lots, utilities and water), he did not have an opinion of their value. The analogous value for the land only for Stonebridge is $120,000. Exhibit B at 30. Mr. Jordan candidly testified that he had no idea what the current value was of the Stonebridge improvements (which would need to be considerably "improved" to make then saleable). Should Debtor make the first payment upon confirmation, Signature's interest in the Canyon Creek Ranch land, up to a value of $1,407,000, would be adequately protected by an equity cushion of about ($1,920,000 – 1,407,000 = $513,000 ÷ $1,407,000 =) 36%. This meets the standard of §1129(b)(2)(A)(iii). Compare Pikes Peak, 779 F.2d at 1459 and 1461 ($3,500,000 value securing $2,887,000 debt [constituting equity cushion after three years of approximately 21%] is both adequate protection and an indubitable equivalent for purposes of §1129(b)(2)(A)(iii)).[25]

DEBTOR'S COMPLIANCE WITH BANKRUPTCY CODE

Signature also raised Debtor's inaccurate statements of post petition debt and debt payments as a basis for denying

_____

[25] The Plan also requires Signature to release its lien on the land which constitutes the right of way for the power line. During closing argument, Signature stated it did not oppose such a release, but wanted something unspecified in return. Debtor agreed to do that. Because of the (understandable) lack of detail about what that swap would be, the Court has not analyzed that transaction for this opinion.

confirmation.  The Court agrees.  In the course of this chapter
11 case, Debtor's affiliates have paid roughly $284,000 to
$293,000 of the estate's post petition expenses, without Debtor
having disclosed either the debts or the payments.  For example,
the December 2006 monthly operating report ("MOR") shows
postpetition liabilities of about $169,000, but Mr. Janes
admitted that if affiliates' advances of about $240,000 from one
affiliate and a smaller amount from another one were taken into
account, the postpetition liability figure would be about
$462,000.  Those expenses and payments should have appeared in
both the MORs and the amended disclosure statement (doc 64).
Because they did not, the  MORs and the disclosure statement were
materially erroneous.  In consequence, the disclosure statement
should never have been approved and is now disapproved, and the
Plan cannot be approved for failure to comply with §1129(a)(2).
In re Prudential Energy, 58 B.R. 857, 867 (Bankr. S.D.N.Y. 1986)
(confirmation denied); In re Crowthers McCall Patterns, Inc., 120
BR 279, 299-300 (Bankr. S.D.N.Y. 1990) (disclosure statement
liquidation value of $35 million was too low; confirmation denied
but DIP authorized to notice higher value of $71-$81 million to
voters and to resolicit); In re Applegate Property, Ltd., 133
B.R. 827, 831-32 (Bankr. W.D. Tx. 1991) (disclosure statement
failed to disclose acquisition of claims by insider; DIP allowed
to amend and resolicit).  Prudential Energy states that the

Page 23 of  27

sufficiency or accuracy of the disclosure statement can be
addressed at confirmation, 58 B.R. at 866 n. 5, and Applegate
Property points out that it is not sufficient that the correct
information could have been gleaned from other parts of file; it
needs to be in the disclosure statement.  133 B.R. at 831.

    The evidence did not suggest that anyone connected with
either Debtor or any of the affiliates intended any deception.
In fact, given Mr. Janes' testimony of how closely related are
the management and the use of all the affiliates' assets, the
Court concludes that Debtor and its affiliates acted in good
faith in using whatever assets were available to pay the expenses
as they arose, just as they were doing prior to the filing of the
petition.  Debtor's balance sheets, Debtor exhibit M, reflect
that practice.  Nevertheless, what may be perfectly acceptable
outside of bankruptcy can lose its legitimacy once a petition is
filed.  As one learned commentator has noted, transparency,
accountability and integrity are the three overarching values of
the bankruptcy process.  Leif Clark, Dicta: Conflicts of
Interest, ABI Journal, Vol 21, No. 3 (April 2002), at 37.  A
material misstatement of post petition expenses and payments
violates the principle of transparency, regardless of the
parties' intent.  The Plan cannot be confirmed.

    The Court has other concerns as well.  For example, the Plan
provides that a creditor whose claim has not been listed by

Debtor must file a proof of claim by the Effective Date or the claim will be barred. ¶9.1. Similarly, a creditor with a scheduled claim is limited to that claim if the creditor fails to file a proof of claim for a different amount by the Effective Date. <u>Id.</u> There is no further provision for notice. That provision might constitute the minimum notice required by the Code. <u>Cf.</u> <u>Sheftelman v. Standard Metals Corp.</u>, 839 F.2d 1383, 1386-87 (10th Cir. 1987) (notice requirements for creditors before approval of plan of reorganization), citing <u>Reliable Electric Co., Inc. v. Olson Const. Co.</u>, 726 F.2d 620 (10th Cir. 1984). Nevertheless, it is a departure from what has been the practice in this district of providing significantly more targeted notice to the claim holder. <u>Cf.</u> <u>Clerk's Practice and Procedure Guide</u>, ¶5.1.17 (Objections to claims) (2nd ed. October 1, 1996). Thus, although this provision by itself would probably not be the basis for not confirming the Plan, it suggests a philosophy on the part of Debtor to ensure the least amount of payment even to creditors holding legitimate claims against the estate.

**Conclusion**

Clearly Debtor's strategy in proposing this Plan was to meet the standards for confirmation with the absolute minimum commitment of resources. The strategy itself is not a reason for not confirming the Plan, since confirmation negotiations and the

Case 06-10011-s11   Doc 131   Filed 12/14/07   Entered 12/14/07 14:13:48 Page 25 of 27

confirmation process are fundamentally a tug of war among competing interests. On the other hand, that strategy increases the risk of failure for a debtor that miscalculates. That is what has happened here. Like a slalom skier who makes (at least) one of his turns too close to the gate and thereby eliminates himself from the race, Debtor's plan, even with the written and oral modifications, cuts the confirmation requirements far too finely to fairly meet them.

For the reasons set forth above, the Court finds that the Plan does not meet the requirements of the Code, and therefore it cannot be confirmed.[26] The Court will enter an order denying confirmation, and setting a status conference within a short period of time to hear from the parties about how this case should further proceed.

Honorable James S. Starzynski
United States Bankruptcy Judge

date entered on docket: December 14, 2007

---

[26] This ruling moots Debtor's request for a ruling on what amount Debtor needs to deposit pursuant to the Plan for the first payment of the Signature claim. Doc 123; Signature objection – doc 129. The Court will enter an order so ruling.

Case 06-10011-s11    Doc 131    Filed 12/14/07    Entered 12/14/07 14:13:48 Page 26 of 27

```
copies to:

Arin Elizabeth Berkson
Moore, Berkson & Gandarilla, P.C.
PO Box 216
Albuquerque, NM 87103-0216

George M Moore
Moore, Berkson & Gandarilla
PO Box 216
Albuquerque, NM 87103-0216

Donald A Walcott
PO Drawer 9570
Santa Fe, NM 87504-9570

Joseph Van R. Clarke
1701 Old Pecos Tr
Santa Fe, NM 87505-4758

Gail Gottlieb
Sutton, Thayer & Browne
PO Box 1945
Albuquerque, NM 87103-1945

Andrew M. Sanchez, Sr.
1701 Old Pecos Tr
Santa Fe, NM 87505-4758

William J Arland, III
PO Box 1357
Santa Fe, NM 87504-1357

James A Askew
PO Box 1888
Albuquerque, NM 87103-1888

Leonard K Martinez-Metzgar
PO Box 608
Albuquerque, NM 87103-0608

Westwater Resources
610 Gold Ave., SW Ste. 111
Albuquerque, NM 87102

DreamCatcher Real Estate Company, Inc.
PO Box 5369
Taos, NM 87571
```